We'll move next to argument in No. 20-3576, DSB Holdings, LLC v. Harvard Steel Sales, LLC Both are first from the appellant, Mr. Shep. Good morning, Your Honors. Matthew Shep for the appellant, DSB Holdings, on its appeal from the district court's dismissal of its Breach of Covenant and Good Faith and Fair Dealing Claim and Summary Judgment. The district court got it right when it said that the appellant had to show that Harvard, the respondent here, acted in bad faith with respect to the toll processing agreement, they call it the TPA, that it signed with GALSTAR. And the appellants here showed that Harvard did not place a single order under the TPA, they paid no invoices under the TPA, and GALSTAR went bankrupt as a result. Now the question is... But didn't the TPA give them the option to do that? The TPA didn't have a minimum order requirement. That's right. It didn't have a minimum order requirement. So usually when we say there's a violation of good faith and fair dealing, it's a violation of the underlying agreement. So if, in fact, they weren't obliged to make any purchases under the TPA, why is that a violation of the agreement? Well, then there would be no purpose at all for the TPA. I mean, it couldn't be the case that... They could have an agreement so they had the option, but they negotiated for no minimum requirement because maybe they would decide not to exercise the option. But there's no indication that that was the case. In fact, if you look at what the evidence shows, it shows that GALSTAR was totally reliant on Harvard for business. Harvard knew this. There were discussions about Harvard taking over GALSTAR without GALSTAR's knowledge. You have evidence that Harvard said they wanted to get out of the deal with GALSTAR. It seems clear that there's at least a plausible explanation that a jury should hear that the real reason that Harvard didn't place any orders and didn't pay any invoices wasn't because it just was bad steel. It wasn't just because they may have had the option. The real reason they did it was because one of two things. It was either because they were conspiring with GALSTAR's biggest bondholder to try and put GALSTAR in terrible financial straits so they could take it over because there's evidence that says that it would have been beneficial for them if they could have taken over GALSTAR. And even Jeremy Jacobs, Harvard's CEO, indicated he wanted equity in GALSTAR. Wouldn't bad steel be a plausible and sufficient reason not to make new deals under a deal-by-deal contract? It could be, yes. But I think that's a question that a jury should decide. It's a plausible. Nobody wants bad services. That's correct. No one does. But it would seem odd in this particular instance because nothing with respect to the steel had changed. It wasn't as if suddenly when they signed the TPA, oh, you know what, the steel's no good. They're saying the steel was never good. Why are they even doing this? Why are they signing a contract if the sole purpose is not to actually pay for the steel and not to order the steel? Well, I mean, isn't there evidence that they had increasing problems with the low-quality steel? They lost customers and they had, you know. They claimed they lost customers afterwards, I believe. And with respect to the quality of the steel, no. If anything, it got better. I mean, there were issues, but they even have testimony from their chief commercial officer that the issues were consistent. Now, they renegotiated the TPA to say that they could reduce the price that they pay to offset the low-quality steel, right? Right. Are you saying that that was also in bad faith, that they did that not because there was low-quality steel but because of a plan to take over GALSTAR? Yes, or because they thought that something bad was going to happen with GALSTAR. They were operating under something where they had to order 5,000 pounds – sorry, 5,000 tons a month, and they had to pay by a certain time. You look at what the actual TPA that they got GALSTAR to sign, those provisions are gone, and now they have to place no minimum orders. Now, Harvard makes a big deal out of the fact that they didn't in fact take over GALSTAR, and so there wasn't a takeover. Now, I take your point that just because a plot to take over a company fails, it doesn't mean that there wasn't a plot. But in fact, everything seems to have worked up until that point, right? There was a collapse of GALSTAR. So how do you explain why they didn't take the next step and take over the company? Daniel Bain, who owned GALSTAR, wouldn't let it happen. You think it's that easy? But wouldn't that have always been the case? Wouldn't that be a problem for the plot from the beginning, that Daniel Bain had the power to prevent the takeover? I think they misjudged it. I mean, is there something in the record that they attempted to take it over and Daniel Bain stopped it? No. Right, so the only evidence is that there were these e-mails earlier on, but there's nothing where they made a move to take it over and Daniel Bain said, I'm not going to allow that. I mean, they was never even approached with that proposal. No, well, there was an approach where Mr. Pynchon, the same plan that he sent to Harvard that he didn't tell GALSTAR about, he sent to Daniel Bain, and that was going to cede operational control of GALSTAR to Harvard. And would Bain say in response to that? He was never going to do that. So there's something in the record where he says, I won't agree to that. I don't know if that's in the record. I mean, I don't know if that's in the record. There was nothing that's subsequent to that e-mail of that plan that suggests that there were further discussions about it. In fact, what's in the record is Daniel Bain thanking Mr. Pynchon for interceding with the landlord and working with him. Right, because at the time he doesn't realize that they're all working behind his back. Well, if one, if approximately 30% or more of the product is defective, then what is their conspiratorial or evil about deciding that somebody ought to take operational control? It's not that they wanted to, it's not the fact that they might want to take it over that's improper. It's the fact that they did it behind his back, and they didn't honor the contract as a means to advance that. Well, it's very often the case, I mean, if you want to buy something, you need to put together investors, and you need to come up with a proposal, and then you come in and you make your proposal. If people say, I'm so surprised by your proposal, sometimes they're happy to get it. Right, but in this particular case, if you're Daniel Bain, and you have these people who are going to put financial pressure on you, I don't think that's the same scenario. I don't think this is just you're coming with an investor who's saying, okay, now I'm interested in buying, do you want to sell? Well, customers put financial pressures on sellers all the time, and in fact, vice versa. That's what business is. Right. What is the improper pressure? The improper pressure here is that they haven't signed an agreement, and then they didn't place any orders. Why is it improper pressure not to enter into a contract, especially with somebody who's producing a poor product? But a poor product, I dispute that only because even Harvard's chief commercial officer testified that this was customary and consistent with a startup. So was there some bad product? Yes. Was it out of the realm of ordinary or standard? No. Standard for a startup. Yes. Standard for a startup, but it's possible that Harvard Steel would just say, well, we can no longer tolerate even what's standard for a startup. Totally agree, but that's not what they did. They said, let's continue this, let's sign this contract, we're going to place orders. But it's not what they did. In fact, they signed a contract that said there's no minimum order requirement and we are allowed to reduce the amount we pay if the product is low quality, right? And Gallagher signed that contract. They did sign the contract, yes. So I guess just to specify what is actually the violation of the underlying contract, you're just saying that when somebody signs a contract that allows them to make purchases but doesn't require it, if they in fact don't make purchases, it's a violation of the contract? No, not that alone, but that in conjunction with what happened here in terms of the potential takeover, yes. So if they didn't make any purchases, they did all the exact same things, but they were not in fact thinking about taking over Gallup Star behind the scenes, it wouldn't be a violation of the contract or a violation of the covenant of good faith and fair dealing? I don't know the answer to that. It's possible, but I don't know. But how could it be a violation? If you take the exact same conduct with respect to the contract in one case and it's not a violation of the contract, how does this, you know, the dealing with Mr. Pynchon make it a violation? I'm sorry, can you say that again? So you're saying, well, I guess I take your point. You're saying you don't know for sure. But you're saying it could have been consistent with the contract for them simply to make no purchases and to refuse to pay invoices based on the quality of this deal. I think it would have been extremely odd for that to happen. Look, I don't think this is a situation where Harvard then placed an order and said, you know what, this just isn't working out. That's not what happened here. They just, they, it seems clear to me at least from the record, they had this contract signed so they didn't have to pay, didn't have to honor it. Didn't have to pay what? Sorry, say that again. Didn't have to honor it. I see, okay. Harvard had to cancel some of their orders because of disruptions at the plant. Didn't that occur after the contract was signed? No, that occurred before. And it was, that occurred in mid-April, and it was back up and running before the contract was signed. And didn't Bain, Bain himself seemed to acknowledge that this wasn't standard quality coming out of a startup. He had that response that this is outrageous. Whoever was responsible for producing, for wrapping these coils should be fired. Isn't that pretty indicative that there were quality problems here beyond the norm? I can't argue that there weren't quality problems. I can just say that they were standard. And I can also say that the complaints about them, when Daniel Bain tried to follow up with them, he couldn't get the information. He couldn't, you know, having a few coils when you have 5,000 tons of steel, a few coils is not a lot. I see I went way over. Okay, so you've reserved. It's time for rebuttals. We'll hear from you again. Let's turn to the appellee, Mr. Alleman. Thank you. Good morning. May I please report? My name is Bill Alleman. I represent the appellee, Harvard Steel Sales. In this case, the appellant filed a complaint that alleged that Harvard Steel Sales participated in a scheme to take over the galvanizing plant at GalStar. We all agree that the appellant then had the burden of identifying hard evidence and specific facts from which a reasonable jury could find that Harvard actually did act in bad faith and participate in a scheme to steal GalStar. The district court found, and we agree, that the appellant didn't meet its burden. However, the parties here engaged in extensive discovery, which included over 27,000 pages of contemporaneous e-mails and other documents and five depositions. Yet at the trial court and below, the appellant relies almost exclusively upon the testimony and deposition – deposition testimony and declarations submitted by its principal, Mr. Bain. Well, why isn't it enough that they had – what is it, the April 25th meeting where Mr. Pynchon purportedly proposed replacing Bain or taking over GalStar? And then after that, the relationship between Harvard Steel and GalStar changed dramatically. And then, of course, there's the proposal later. I mean those are pieces of evidence that don't depend on Mr. Bain's testimony. So why isn't that enough to infer that they had some kind of ulterior motive? So I think what we have in the record viewed most favorably in the appellant's favor is a meeting occurred in which, as characterized by the appellant, Mr. Pynchon sought to enlist Harvard to take over GalStar. Now, whether that's true doesn't show any conduct by Harvard. The idea that there was a 180-degree change after that meeting is also not borne out by the record. I think, as Your Honor noted, Harvard consistently from the beginning of 2013 in January, February, March, April, May, and June sent emails in which Mr. Jacobs was frank and forthright about the quality issues at GalStar, about the items coming off of that production line and the need to address them. Isn't it right that a lot of those communications are we have to deal with these quality issues, but we're going to work through it, and let's work together, and so on? I mean a jury could say that the relationship seems to have changed after the April 25th meeting. Again, I think the relationship stays consistent. We look specifically at the March 20th email in which Mr. Jacobs tells Mr. Bain, look, we're moving forward, but no, the next time we send this invoice, we're going to have to take debits. And there's other emails where they attempt to reconcile that shortly after the May 2nd and May 3rd emails that we see. And so I don't see a radical change there. Well, why didn't Harvard make any orders under the new TPA? It didn't make any orders, and the record is clear on this, because Mr. Bain specifically asked Harvard repeatedly at the time to make a record of this fact, that Harvard canceled its May and June orders because of the equipment failures that occurred in April of 2013. Mr. Bain wanted to submit an insurance claim because of that and asked to get evidence from Harvard saying we were going to make May and June orders, but we canceled them because of this failure. So it ties back to the equipment failure. They canceled those orders, but they could have made subsequent orders, couldn't they have? Well, by that point, Mr. Bain was refusing to allow any steel to exit his plant because he was demanding payment in full, notwithstanding the fact that Harvard had offered to compromise to pay a certain amount to release some steel and also escrow, another amount of money. But Harvard offered to pay something like $25,000 on the $500,000 bill. Is that right? I believe Harvard offered to pay $42,000 and escrow $250,000. I see. Right. And then the only other point I'd like to make, because we heard a lot about evidence and obviously— And that was all a discount for what Harvard claimed was the low-quality steel. They were reconciling to go through—yes. It was a pretty dramatic discount from $500,000 to $40-something thousand, right? It was a pretty dramatic— So do you agree that the lower-quality steel is still typical of a startup? That's certainly what the record reflects, that lower-quality steel is consistent with a startup. I don't think that's a material— Right. So if the lower-quality steel is something like 30% of the steel is not good enough quality, I mean a reduction from $500,000 to $45,000 is more than 30%, right? Well, but Harvard's not paying for steel that's consistent with a startup-quality steel. Harvard's paying for prime-quality steel that it can sell to its customers. And so it's going through the process using Galstar's own production reports to reconcile what coils were good, what coils were bad, and come up with a reasonable payment on that. And that's what occurred after the April and May meetings. It was no surprise to Harvard that there were quality issues with the steel. Harvard was consistently concerned with the quality of Galstar's product. Why did Harvard then enter into the TPA on May 3rd? Well, Harvard executed the TPA on May 3rd. The TPA is expressly effective as of December of 2012. And so it memorializes the agreement all along. The only—if I may, just in closing— well, it memorializes the agreement, but the retroactivity seems to suggest, well, maybe they were really just trying to get out of their earlier obligations. How should we read that if they made it retroactive to 2012 even though they signed it late in 2013? Well, I'm not sure what earlier obligations— Well, I don't know. I mean maybe they wanted to reduce the amount they owed on outstanding invoices. Maybe they didn't want to actually fulfill any orders that they might have been obliged to do under the previous TPA. Well, I don't think there was a previous TPA. Any kind of previous arrangement, I don't know. So our view is that there was one arrangement. The parties were operating under an agreement that was eventually memorialized in the May 3rd TPA. So you're saying that the May 3rd TPA didn't change anything? The May 3rd TPA memorializes what had been going on since December of 2012. Oh, and so the back and forth over whether they could reduce the amount they paid for the low-quality steel, even though there was back and forth on that, you're saying that that was not a new term. That had been the understanding all along. Well, I believe what you see in those emails is Mr. Jacobs repeatedly asking to have the agreement that Mr. Bain prepared revised to reflect that agreement, and Mr. Bain does revise it to reflect that agreement, and then Mr. Bain signs it. So then your position is that there never was an obligation to order any steel because the TPA doesn't require a minimum order or anything. So you're saying that if that just reflected the terms under which they'd been operating all along, then they essentially never agreed to purchase any steel? There's certainly no minimum steel order requirement that Harvard obligated itself to. If I may make one more point, I see that I've gone over time, but there's this notion that permeates through the briefing from the appellant that Mr. Jacobs and Mr. Pinchon were talking behind his back, and I just want to make clear that the entire record in this case of over 27,000 pages reflects only two unsolicited emails from Mr. Pinchon to Mr. Jacobs. Mr. Jacobs' single email response in which he asked to have a telephone call about it and Mr. Jacobs and Mr. Aren't there a lot of coincidences here, right? So there's the April 25th meeting, and then shortly after that they want the new TPA that makes it easier to not pay GalStar. And then there's an accidental email exchange. What you say is an accidental email exchange where Pinchon sends this plan, actually two emails, right? It's not just one errant email. It's two emails to Jacobs. And you say, well, that was a mistake. And so that's a lot of coincidences. I mean why couldn't a jury say, well, it's not a coincidence? I think the one point that perhaps we could have made better in our brief on that point, it's in there, but we don't draw out as well as we could. The idea that Mr. Jacobs was applying pressure after the April 25th meeting to get the TPA signed is belied by the fact that the TPA discussion is renewed by Mr. Bain himself by an email that he sends on April 28th. So what the actual timeline is, there's a meeting on April 25th. Mr. Bain on April 28th emails Mr. Jacobs and says, here's the TPA. Can you sign it? Mr. Jacobs then has his attorney mark it up, send it back. Mr. Jacobs sends it back on May 2nd before he receives any email from Mr. Pinchon and says, here's the agreement I'd like to sign. Mr. Bain happens to sign that agreement the next day on May 3rd. But the timeline doesn't bear out this idea that there's a relationship between the TPA and the April 25th meeting and the May 3rd email. It just doesn't line up. I don't think any reasonable jury, when presented with these contemporaneous emails, could render a decision that's reasonable in favor of the appellant here. Unless the Court has any other questions, I thank the Court. All right. Thank you, Mr. Alleman. We'll turn back to Mr. Shepp on rebuttal. I would just like to make one quick point, unless the Court has other questions, which is I don't think it's accurate to say that Mr. Bain was the one who started this whole conversation about the TPA. I think everything has to be taken in the context of all the additional emails that were going back and forth after the April meeting. There's pressure being put on by the landlord that Mr. Pinchon is trying to mediate. There are, again, the back and forth that Daniel Bain doesn't know about. And to understand that, again, Daniel Bain asked Jeremy Jacobs after that April 25th meeting what was discussed when he was asked to leave the room. And he was told by Jeremy Jacobs, nothing had to do with business, not with GALSTAR. And that wasn't true, as even Mr. Pinchon testified that he did talk about a takeover of GALSTAR at that meeting. So can I ask about a point that Mr. Alleman made? So do you agree that the TPA memorialized the terms on which Harvard and GALSTAR had been operating all along? No, I don't. Because it seems like your position is that it altered the terms. I do believe it altered the terms. How did it do this? I'm sorry? How did it do this? In particular with the change in the minimum. It had a monthly minimum of 5,000 tons and a 180-day cancellation period. What happened to the minimum? The draft that they had been operating under. They drafted the TPA, which you can see is marked up. I can get you the record site in a minute. It shows the changes that were made right before then that do reference the nonconforming price but also take away this 180-day cancellation period and take away the minimum of 5,000 tons per month. Sorry. Well, but you don't dispute that GALSTAR did actually agree to the TPA. And so we do have to honor those terms. I wish I could, but I cannot. Right. Okay. Okay. Are there other questions? Thank you, Mr. Sheff. The case is submitted. Thank you very much.